Good morning. May it please the court, my name is Adriano Martinez and I'm representing the Natural Resources Defense Council. Since NRDC's petition has been consolidated with AIR's petition, we'll be splitting up argument. I'm going to do ten minutes addressing two issues. One, whether a new attainment demonstration was required as a result of the plan submitted by the agencies in Southern California. And two, whether EPA violated the Clean Air Act in failing to require additional transportation control measures. My colleague Brent Newell will be addressing the standing issues related to the pesticide element and he'll take five minutes. We're going to reserve five minutes for rebuttal. As EPA's brief points out, exactly two weeks from today, the Los Angeles region will fail to achieve the one-hour ozone standard. Despite Congress giving it more than 30 years to attain this standard, there is currently no plan in place that puts Los Angeles on a path to meet this standard. This problem is being forced on the residents, including NRDC's members, for several reasons. One, is EPA is not doing its job in requiring the region to get on a path to meeting this standard. Two, it's not ensuring that the region is adopting enforceable control measures like those required to reduce harmful pesticide pollution. And three, it's not requiring that the region truly tackle one of the largest problems for non-attainment, namely transportation emissions. I'll start addressing whether the one-hour plan, whether a one-hour attainment demonstration was required. And initially, I just want to demonstrate the importance of the attainment demonstration. Basically, that's what's used to show that the region will meet a clean air standard. That is the basic fundamental of the Clean Air Act. It was passed in 1970 to ensure that regions, including regions like Los Angeles with some of the worst air quality problems, will meet air quality standards on time. Now, the first issue is the 2003 ozone plan was required under the Act. Our brief outlines several rationales, including requirements for periodic revisions, the transportation conformity provisions, and the fact that it was submitted and it was a wholesale revision requiring significant more reductions in pollution, especially from transportation-related sources. Also, the case law in this circuit supports this interpretation. As the Hall v. EPA's case demonstrates, the non-attainment provisions of the bill are designed to ensure regular progress towards attainment. And then they also reiterate that EPA's basic review proceedings are to ensure that the regions are going towards attainment. Now, allowing EPA to sit idly by while a clearly inadequate plan is in place and not do anything is not acceptable. It means that residents in Los Angeles will be forced to breathe unhealthy air for many more years to come. Now I'll move to the second issue, which is whether transportation control measures are required under Section 182 D1A of the Act. Basically, this provision was designed to ensure that the most polluted areas in the nation, those classified as severe and extreme areas such as the Los Angeles region, the San Joaquin Valley, are covered under this provision. They're basically required to adopt transportation control measures to address two separate instances. One is to offset a growth in emissions from growth in VMT, and second, to offset the growth in emissions from total vehicle emissions in the region. Now, the briefs lay out pretty extensively that the text of the Act supports this interpretation. Basically, what EPA is arguing in its brief is that we essentially write out the growth in VMT from it and just solely lump in all the emissions in the region. And then second, the full context of Section 182 D1A, we have several pieces and sites to legislative history that support the interpretation that it was intended to reduce the incremental increase of emissions from vehicle miles traveled. And then second, just the overall desire of the Act to push attainment. I think the Act addresses mobile sources and takes them very seriously. Congress even included several measures, basically a menu of options that regions can use to meet these standards. These include smart shuttles, vanpools, and they're located in Section 108 of the Act. So essentially what EPA is left to argue are policy rationales for why it is purportedly undesirable in the most polluted regions in the nation not to require aggressive controls on transportation emissions. EPA essentially labels these measures as draconian, but this cannot get past Congress's clear intent that regions like Los Angeles reduce their emissions from the transportation system. The record shows that the lion's share or a large percentage of the emissions in the region are from the transportation system. To end, and then I'll pass on to my colleague Brent Newell, I just want to reiterate that Congress passed the Clean Air Act in 1970 and essentially created a promise to residents in the region. And that promise was that residents will meet clean air on time. They reaffirmed this in 1990 and gave more teeth to the Clean Air Act. And right now this promise isn't being fulfilled in the Los Angeles region because we can't even meet the most basic of standards. And EPA is sitting back idly as we're not addressing these transportation control measures that are vital to meeting attainment. Thank you. Thank you. Thank you, and may it please the Court. And my name is Brent Newell. This petition is, with respect to the pesticide issue, is substantively identical to the prior petition. The same substantive issues come up, but it's procedurally very different. And the reason it's very different is, as my colleague said, California chose to submit a wholesale revision of the strategy to meet the one-hour ozone standard in 2003. They called it the 2003 State Strategy. And in that strategy they included a commitment called PEST-1, P-E-S-T-1. And PEST-1, the Court can find it at the Petitioner's Excerpts of Record 256. And I don't think it's necessary to read that to the Court, but basically what they said was, as described back in 1994 and in EPA's preamble, DPR committed to reducing pesticide-related volatile organic compound emissions. And it referenced the Wells Memorandum date and deadline. It referenced the specific percentages that were called interim targets and also the final target. So basically what California did in 2003 was just resubmit it, send it in again to EPA as part of this new strategy to meet the ozone standard. Now, EPA only defends this petition, pesticide issue, only defends this issue on standing. So it doesn't contest the merits again. It doesn't dispute that the Clean Air Act requires enforceable commitments. It doesn't dispute that PEST-1 lacks an enforceable commitment after the Warmer Dam decision. And it doesn't dispute that its approval of PEST-1 violates the Clean Air Act. It's just standing. So I will quickly address the standing point. There's injury in fact. We've demonstrated injury in fact through the declarations that are attached to our brief. In terms of causation, EPA claims there's no causation here, that what they did in this rulemaking didn't cause any injury. The reality is that EPA has a nondiscretionary duty to review the entire SIF submission and may approve it only if it meets all of the Act's requirements. And that's in 42 United States Code, Section 7410K3. EPA can't argue away the fact that California submitted a wholesale revision. And it can't argue away the fact that Congress told EPA that they had to review everything and make sure that everything complies with the Act. EPA must review PEST-1 and determine whether it's legal. There's no other way to interpret Section 110K3. And the plain language of the statute controls under Chevron. So there's no room to give EPA the deference here that it's trying to create. We demonstrate causation because EPA's violation does not give effect to the statutory remedy, which is disapproval. And third, there's redressability. Because vacating and remanding the matter to EPA with direction to proceed, consistent with the Court's opinion, leads to three inescapable mandatory actions that EPA has to do. First, what's called the SIP call. So whenever EPA finds that a SIP doesn't meet the Act's requirements, it shall tell the State to fix it. Whenever the second point is whenever EPA finds that a SIP submission doesn't meet the Act's requirements, it's supposed to start the sanctions clock, which is a grace period, like a credit card bill, before which transportation funds are withheld and other bad things happen to the State. And the third thing is that if the problem isn't corrected and submitted EPA and EPA approves it, then EPA is supposed to take over that particular component of planning. So there's redressability. And that's all that I have, unless the Court has any questions. Thank you, Counsel. Thank you. Good morning, Your Honors. May it please the Court. My name is Austin Saylor from the United States Department of Justice. At the Council table is Meredith Weinberg from the Department of Justice as well, and Jefferson Whalen from EPA. Petitioners challenge EPA's 2009 action, approving in part and disapproving in part, several Clean Air Act submissions from the State of California regarding the State's plan for meeting air quality standards for ozone in the Los Angeles metropolitan area. Petitioners' challenges must be rejected for three reasons. First, petitioners lack standing to challenge EPA's approval in this rulemaking of California's commitment to continue to implement the existing strategy for reducing VOC emissions from pesticide applications. Petitioners' alleged injuries are not fairly traceable to EPA's action here, and nor would a favorable ruling from this Court redress their injuries. Second, EPA properly found that because California already had an approved attainment demonstration for the one-hour ozone standard, that EPA's disapproval in this rulemaking of the State's voluntary revisions to that same standard did not trigger the clocks to promulgate a federal implementation plan or to impose sanctions on the State. And third, EPA reasonably interpreted the Clean Air Act to allow California to comply with the emissions offset requirement of Section 182 D1A by showing an annual decrease in aggregate motor vehicle emissions each year through the attainment year. On the first point, that petitioners do not have standing to challenge EPA's 2009 approval of PEST-1, EPA's approval of this 2003 State strategy, PEST-1, merely maintained the status quo with respect to the existing pesticide element and did not cause petitioners' injuries. Significantly, EPA's action did not continue in effect a provision that would have otherwise expired, nor would the agency's disapproval have invalidated the existing 1997 pesticide element. The bottom line here is that regardless of any acknowledgment or approval by EPA in this rulemaking, the existing pesticide element would have continued in effect. So even if EPA had disapproved PEST-1, EPA could not have commanded California to revise the 1997 pesticide element, which was the approved SIP element. The Clean Air Act mechanism by which EPA commands revision of approved SIP elements is through a SIP call of Section 110 K5, as we noted in the briefs. However, such action was not implicated in this rulemaking. As to redressability, as I mentioned before, a favorable ruling from this Court would not redress petitioners' injuries. The reason is that the State's 2003 commitment to maintain the status quo was, even if EPA's approval of that commitment was arbitrary and capricious, on remand, short of a SIP call, which is discretionary with EPA, the agency would have no power to compel the State to revise that 1997 pesticide element. Significantly, what California did not submit is the existing pesticide element. It submitted its commitment to continue to implement that element. And EPA's review under 110 K3 is of the revision. And here the revision was the commitment to continue to implement. As EPA noted in the rulemaking, its approval meant, again, that the SIP would continue to reflect the strategy as EPA approved it in 1997. Petitioners argue that California intended the 2003 submission to replace the existing pesticide strategy, but that's emphatically not the case. As EPA noted in the rulemaking, PEST-1 does not replace the existing SIP provision. On the second point, this is regarding the one-hour ozone attainment demonstration. EPA's disapproval of the attainment demonstration here did not trigger the FIP or sanctions clocks. The question is whether EPA had an obligation to impose a FIP or sanctions when it disapproved the voluntarily revised attainment demonstration. The answer is no. Petitioners' claim misunderstands the nature of EPA's review of SIP revisions. Under 110 K3, when EPA reviews a SIP revision, it checks to ensure whether that revision complies with the act. The agency does not re-review the entire SIP, and whereas here the proposed revision is to an already approved provision in the SIP, EPA does not re-review that already approved provision. But if it's pointed out to EPA that there are serious deficiencies in that prior SIP, you know, you're headed to a train wreck inevitably, isn't there some responsibility on the EPA to do something about that? Yes, Your Honor. Citizens can petition EPA through the 110 K5 SIP call process. They can petition the agency to enact a SIP call, or the agency can do so on its own volition. However, petitioners here have not submitted such a petition to the agency, and that's the proper Clean Air Act mechanism by which such revision would be done. So if EPA, under 110 K5, the language is whether EPA finds that the SIP as a whole is substantially inadequate to attain the standard, in that case, then yes, that's the appropriate way for the agency to command a revision if it looks like that's going to happen. And I'll also note that the SIP call process is important because it provides notice to the state of the inadequacy and allows it time to fix the problem. And it also involves a public notice process in the Federal Register and creates a record. I'll note, too, that Section 110 C1b, which is the provision of the Act, which says that EPA should promulgate a federal implementation plan upon disapproval of certain SIP submissions, that particular provision does not apply for voluntary submissions such as are at issue in this case. The reason behind that — So if we take all your arguments at face value, at the end of the day, we have an inadequate SIP and the state files a supplemental submission that's inadequate and we're left with an initially inadequate SIP, aren't we? That's the bottom line of the EPA's position here. The one-hour ozone SIP, Your Honor, it remains — the one approved in 1997 remains in effect, and Petitioners do allege that it's inadequate. Yes. However, I would note that the eight-hour standard — Right, but going back to that just for a minute. I mean, if we take what they say is true, and you may dispute that, isn't that what we're left with if we adopt your position that we can't revise it, we go back to the inadequate standard, and EPA has no obligation to revisit a standard that will not meet the ambient air quality standards? EPA, assuming it's true that the plan is inadequate, EPA would have, as I mentioned earlier, the 110-K-5 process. That's the process by which EPA, if it determines that the SIP is substantially inadequate, as in this scenario it would be, in that case, EPA has the power to compel a revision. That's the process provided by the Clean Air Act, and that's the process that should be used in that case. I'll move on to the TCM offset provision, section 182D1A. This issue presents a pure question of statutory interpretation, under which EPA is due significant deference under Chevron. The statute is ambiguous as to the baseline by which a growth in emissions must be measured. Petitioners posit that transportation control measures are required whenever there is any increase in VMT, regardless of whether there is any consequent growth in vehicle emissions. EPA interprets the statute to mean that transportation control measures are only required where a growth in vehicle miles traveled will result in an aggregate increase in motor vehicle emissions. So the statute plainly states that the duty to submit transportation control measures is triggered by a growth in emissions that is a result of the growth in vehicle miles traveled, but it doesn't specify how this growth in emissions is to be measured or substantiated. So as to the baseline, it's ambiguous. I'll also note that petitioners don't dispute California's showing here that aggregate vehicle emissions will decrease through the attainment year. Their argument is that the statute on its face requires EPA to command transportation control measures. Unless the Court has any further questions, EPA rests on its briefs. Thank you. Thank you. EPA admits that it has the authority under Section 110K5 to do a SIP call, and that, I think, hits redressability right on the head. You know, the Court would find that EPA violated the Act when it approved this new commitment to continue to implement the SIP call. The old commitment, that would, with direction EPA to proceed according to the Court's decision, would trigger 110K5, and EPA would then have a mandatory duty to compel a revision. So I think there's undoubtedly a redressability here in this case, and the petitioners have standing. Thanks, Mr. Brown. I'll be very brief, but I wanted to address a couple issues. The first is regards whether an attainment demonstration is required, and EPA relies on the SIP call provisions of the Act. First, we should note that EPA does not need a petition to act on a plan. If it's before them, they can duly engage in that process. And then the second issue is EPA was aware just simply by the SIP submission that the plan was inadequate. So you feel they have an affirmative obligation to trigger the SIP plan under and their failure to act was arbitrary and capricious? Yes, yes. And then the other issue is there's discussion about assuming it's true that the plan will not meet attainment. This is not hypothetical. At the end of the Federal Register notice and the final rule, EPA disapproves the attainment demonstration because the commitments had been removed. The only logical reading of that is that there will not be attainment, despite the purported progress that has been noted in the brief. Now, the final issue are the transportation control measures. I think there is a deference here. The language is clear. Petitioners cited to several pieces of statutory interpretation. Even in the Federal Register notice, EPA notes that the statutory interpretation appears to support petitioners' reading. And then the last thing is essentially EPA's interpretation just writes this increase in VMT out of the regulation, out of the Clean Air Act, which is not permitted by traditional canons of statutory interpretation. Thank you. Thank you, counsel. Patient Herb will be submitted for decision. I want to thank all of you for your arguments and your briefs on the case and for traveling out here and presenting the arguments today. I want to thank our courtroom deputy, Alex Lasnik, for his fine work today. And with that, we'll be adjourned. Hear ye, hear ye. All persons having had business with the Honorable, the United States Court of Appeals for the Ninth Circuit will now depart. For this court, for this session, it now stands adjourned.
judges: Lasnik, Hall, Thomas